IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

TELECOMMUNICATION SYSTEMS, INC.,

                                                Plaintiff,

                              v.                          Civil Action Number 3:06CV485

MOBILE 365, INC.,

                                                 Defendant.

**MEMORANDUM OPINION**

THIS MATTER comes before the Court on Mobile 365, Inc.'s ("Mobile 365") Motion for Summary Judgment and Telecommunication Systems, Inc.'s ("TCS") Motion for Summary Judgment. For the reasons expressed below, both Motions are DENIED.

**I.**

**A.**    **The Parties and Alleged Infringement**

TCS is a publicly-traded technology company and a leading provider of mission-critical wireless data solutions to wireless carriers, enterprise and government customers. TCS's products include, among other things, location-based 911 services, messaging and location service infrastructure to wireless operators, real-time market data and alerts for financial institutions, mobile asset management, mobile office solutions, and encrypted satellite communications for government customers. Among the patents owned by TCS is United States Patent Number 6,985,748 ("the '748 patent"). TCS manufactures and sells products and systems covered by the '748 patent, including its Wireless Messaging Gateway™ and Message Distribution Center.

TCS alleges that Mobile 365 is infringing the '748 patent through, among other activities, the manufacture, use, importation, sale and/or offer for sale of products, services and technology permitting the intercarrier routing of "short message service" (SMS) messages, commonly known as "text messages," in which message senders address message recipients using only the recipient's telephone number. Mobile 365 markets these allegedly infringing products, services, and technologies under the brand name "InphoXchange." These products and services compete with TCS's Wireless Messaging Gateway™ and Message Distribution Center, which are covered by the '748 patent.

**B.     SMS Messaging**

Telephone subscriber-to-subscriber messaging originated in the early 1990s, especially in the form known as SMS messaging, commonly referred to as "texting." By April 1999, telephone subscribers in the European Union were sending one billion SMS messages per month and by 2004, subscribers worldwide sent over 26 billion SMS messages a year. In the United States, the popularity of SMS messaging has lagged behind Europe and Asia. This has been largely attributed to the higher costs of SMS messaging in the United States and to U.S. subscribers' greater access to e-mail and other messaging services via home computers or Blackberry-like devices.

One complicating factor in enabling SMS messaging, both worldwide and in the United States, is facilitating communication between different telephone carriers, so that a subscriber of one carrier (e.g., Verizon) can send a message to a subscriber of a different carrier (e.g., T-Mobile). Without interconnection, a carrier can only deliver SMS messages between and among its own subscribers because the carrier cannot connect to a different carrier's subscriber in order to deliver an SMS message. *Inter*-carrier connections, however, allow carriers to provide their subscribers

with inter-carrier delivery, so that an SMS message sent by a subscriber of a first carrier can be delivered to a subscriber of a second carrier.

**C.     Technological Background**

A subscriber sends an SMS to a recipient from her mobile station (MS), such as a cellphone. She can address the SMS message with the recipient's mobile identification number (MIN), which is the telephone number of the recipient's mobile phone. The MS sends the SMS message, which is then transmitted wirelessly to a base station or cell phone antenna belonging to the subscriber's carrier using a predetermined air protocol.[1] The base station then sends the SMS message to a Mobile Switching Center ("MSC"), which passes the SMS message to a Short Message Service Center ("SMSC"). The SMSC receives the SMS message, and processes it for delivery. If the recipient is a subscriber of the carrier, then the SMSC forwards the SMS message to the MSC, which then sends it to the base station currently servicing the recipient. This is known as *intra*-carrier messaging.

If the recipient is not a subscriber of the sender's carrier, however, the SMSC cannot deliver the message unless there is some sort of *inter*-carrier connection. These inter-carrier connections can be established in different ways. One way is for the telephone carriers to connect directly to each other, via dedicated connections. This was the approach taken in the United Kingdom, where by 1998 carriers O2, Orange, Vodafone, and T-Mobile were interconnected for inter-carrier SMS message delivery. Likewise, by 1999, multiple carriers in Singapore were interconnected and made interoperable. Another way, as explained by the '748 patent, is for the sender to enter as the

---

[1] A protocol is a set of standards or rules that define exact formats for communication between systems.

destination address an "email address" that includes the recipient's telephone number, the "@" sign, and a unique domain name used specifically for SMS messaging, *e.g.*, 4105551212@mobile.att.net. Entering such an address is, according to the '748 patent, cumbersome, and sometimes not even possible, because a sender may not know the recipient's wireless carrier, let alone the proper email address to use.

**D.     The Inventions Claimed in the '748 Patent**

The claimed inventions overcame features that previously make it more complicated and, in some instances, more difficult for users to send and receive an SMS.  In the United States there are several different competing wireless telephone providers.  Unfortunately, however, "each major US carrier has deployed a different, competing air interface technology . . . . There are approximately ten (10) different air interface technology protocols currently in use in the United States."  Col. 4:6–14.  While these differences allow "carriers to differentiate their services from one another, the US consumer suffers inconvenience because of the lack of standardization and/or interoperability across networks."  Col. 4:15–18.

The '748 patent made it simpler for users of different wireless carriers to send SMS messages to one another.  Specifically, the claimed inventions of the '748 patent enable a user of one wireless carrier to send an SMS to a recipient user of a different wireless carrier by addressing the SMS message only to the recipient's telephone number, without requiring the additional email extension associated with the recipient's carrier.  For a given message, if the intended recipient is outside of the sender's carrier network, the inter-carrier messaging module determines the appropriate carrier for the recipient, appends the appropriate carrier-specific syntax to the phone number to allow delivery, and routes the SMS message to the destination carrier.

Specifically, the inter-carrier messaging module receives an SMS message addressed with only a MIN number, performs a look-up in the database associating subscriber MIN numbers and in the database associating carriers with routing syntax, and adds routing syntax determined from the look-up to the MIN number. Col. 4:48–58. In another embodiment, upon receipt of an initial SMS message addressed to a MIN only, a carrier providing service to the MIN is first associated therewith. Then, a new SMS message is formulated including a body of the initial short message and newly addressed to the MIN with a syntax associated with the carrier providing service to the MIN. The new short message is then appropriately routed. Col. 4:59–67.

## II.

A motion for summary judgment lies only where "there is no genuine issue as to any material fact" and where the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See also Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court must view the facts and the inferences drawn therefrom in the light most favorable to nonmoving party. Ballinger v. North Carolina Agr. Extension Serv., 815 F.2d 1001, 1004 (4th Cir. 1987). While viewing the facts in such a manner, the Court looks to the affidavits or other specific facts to determine whether a triable issue exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. However, if a motion for summary judgment is properly supported by affidavits, depositions, or answers to interrogatories, the nonmoving party "may not rest on mere allegations or denials of the pleadings but . . . must set forth specific facts showing that there is a genuine issue for trial." Id. (internal quotation marks omitted). It is well settled that claims of a patent are "afforded a statutory presumption of validity," and that overcoming that

presumption of validity "requires that any facts supporting a holding of invalidity must be proved by clear and convincing evidence." Budde v. Harley-Davidson, Inc., 250 F.3d 1369, 1376 (Fed. Cir. 2001).

### III.

#### A. Mobile 365's Motion for Summary Judgment

Mobile 365 argues that it is entitled to summary judgment because: (1) its system for routing inter-carrier SMS messages sent peer-to-peer ("P2P") between mobile phones on different wireless networks does not infringe any asserted claims of the '748 patent; (2) the claims are invalid under 35 U.S.C. § 102(g)(2) by Mobile 365's prior art invention of InphoXchange; or (3) the claims are invalid under 35 U.S.C. § 102(b) by IC3S's offer for sale of inter-carrier SMS P2P message routing services in this country more than one year prior to the earliest filing date of the '748 patent. In the alternative, Mobile 365 argues that it is entitled to partial summary judgment because: (4) TCS is not entitled to lost profit damages because it did not lose sales to Mobile 365; and/or (5) TCS is not entitled to damages with respect to any manufacture, use, sale, or offer for sale of the patented invention prior to the January 10, 2006 issue date of the '748 patent.

##### 1. Non-Infringement

The functionality of Mobile 365's SMS message routing system is undisputed. The only dispute concerns whether that functionality satisfies the '748 patent claims, as they have been construed by the Court. Mobile 365 argues that at least two claim limitations or their substantial equivalents are absent from the accused SMS message routing system. First, Mobile 365 argues that it does not receive digital message packets that are "addressed with only a phone number" or "addressed to a phone number only," as those phrases have been construed by the Court. Rather,

6

digital message packets received by Mobile 365 include address information that enables the packets to be routed from the Short Message Service Center (SMSC) of the wireless carrier to Mobile 365. Second, Mobile 365 argues that when routing messages via SMPP it does not "attach to" or "insert within" the destination telephone number information to enable the message to be routed. Instead, it uses a series of queues to move SMS messages to the proper outbound channel for the destination carrier. The Court finds that these are issues of material fact best resolved by a jury.

    **2.       35 U.S.C. § 102(g)(2)**

See section III.B, infra.

    **3.       35 U.S.C. § 102(b)**

Mobile 365 argues that the claims are invalid under 35 U.S.C. § 102(b) by IC3S's offer for sale of inter-carrier SMS P2P message routing services in this country more than one year prior to the earliest filing date of the '748 patent. Section 102(b) provides:

> A person shall be entitled to a patent unless . . . (b) the invention was patented or described in printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . .

Under this provision of the patent statute, "no person is entitled to patent an 'invention' that has been 'on sale' more than one year before filing a patent application." Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 57 (1998). The date exactly one year prior to the date of the application for the patent is known as the "critical date." Id. The critical date in this case is September 5, 2000. "[T]he on-sale bar applies when two conditions are satisfied before the critical date. First, the product must be the subject of a commercial offer for sale. . . . Second, the invention must be ready for patenting." Id. at 67. An invention is considered "ready for patenting" if it was reduced to practice prior to the critical date or if prior to the critical date, "the inventor had prepared drawings or other descriptions

of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." Id. at 67–68. The final step in assessing an on-sale bar defense "involves a comparison of the asserted claims with the device or process that was sold." Minton v. Nat'l Ass'n of Sec. Dealers, Inc., 336 F.3d 1373, 1376 (Fed. Cir. 2003). A claim is anticipated if "each and every limitation is found either expressly or inherently" in the device or process that was sold. Id. (internal quotation marks omitted). Whether there has been a "'sale' within the meaning of 35 U.S.C. § 102 (b) [is] a question of law based on underlying facts." Id.

Mobile 365 maintains that: (1) IC3S made a commercial offer for sale of inter-carrier SMS message routing services to InphoMatch on August 2, 2000; (2) IC3S's inter-carrier SMS message routing system known as Gucky was reduced to practice prior to August 3, 2000; and (3) IC3S's Gucky system for routing inter-carrier SMS messages embodied each and every limitation of the '748 patent claims, as currently being interpreted and applied by TCS in this litigation. The Court finds summary judgment is improper on this claim because the facts remain hotly contested and merit further development.

### 4. Lost Profit Damages

Mobile 365 argues that TCS is not entitled to lost profit damages because it did not lose sales to Mobile 365. The Federal Circuit has accepted the four-part Panduit test as the non-exclusive standard for determining lost profits. This test requires a plaintiff to prove: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir. 1978). "The Panduit test . . . operates under [the] inherent assumption . . . that the patent owner and the infringer sell

products sufficiently similar to compete against each other in the same market segment." BIC Leisure Prods., Inc. v. Windsurfing Int'l, 1 F.3d 1214, 1218 (Fed. Cir. 1993).

In support of its Motion, Mobile 365 notes that TCS has never sold any product covered by the '748 patent, much less a product that was sufficiently similar to compete in the same market with Mobile 365's SMS Exchange. Therefore, TCS's claim for lost profit damages is entirely speculative and should not be permitted to be presented to a jury. TCS contends that "but for" the alleged infringement of its patent, it would be selling the patented service. There is no single method (such as market share) by which a patentee must demonstrate an entitlement to lost profits; "the methodology of assessing and computing damages is committed to the sound discretion of the district court." State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1576–77 (Fed. Cir. 1989). The Court finds that further factual development is necessary on this issue, and accordingly, summary judgment is improper.

**5.    Pre-Issuance Damages**

The Patent Act, 35 U.S.C. § 154(d), provides that " a patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent . . . and ending on the date the patent is issued" engages in activities amounting to infringement of the application's claims. To recover pre-issuance damages, the defendant must have "had actual notice of the published patent application." Id. Mobile 365 argues that TCS is not entitled to damages with respect to any manufacture, use, sale, or offer for sale of the patented invention prior to the January 10, 2006 issue date of the '748 patent because TCS failed to provide the "actual notice" required under § 154(d). Citing to Classen Immunotherapies, Inc. v. King Pharms., Inc., 403 F. Supp. 2d 451, 457–58 (D. Md. 2005), TCS

maintains that it sent the '748 application to Mobile 365 in the context of licensing discussions. Specifically, the communications followed up on a letter from TCS's CEO to Mobile 365 which offered a license under a related patent. The Court finds that whether or not TCS provided Mobile 365 with the requisite notice is a question of fact that should be decided by the jury. See Maxwell v. J. Baker, Inc., 86 F.3d 1098, 1111 (Fed. Cir. 1996).

### B. TCS's Motion for Summary Judgment

TCS maintains that it is entitled to summary judgment on Mobile 365's 35 U.S.C. § 102(g)(2) defense. This is essentially the same issue as III.A.2 above. Mobile 365 argues that its prior invention of InphoXchange is prior art to TCS's '748 patent under § 102(g)(2). That section provides:

> A person shall be entitled to a patent unless . . . (g) . . . (2) before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it. In determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 102(g)(2). Mobile 365 has the burden of demonstrating prior invention by clear and convincing evidence. Once that burden is met, the burden shifts to TCS to "produce evidence sufficient to create a genuine issue of material fact as to whether [Mobile 365] abandoned, suppressed, or concealed the invention." Dow Chemical Co. v. Astro-Valcour, Inc., 267 F.3d 1334, 1339 (Fed. Cir. 2001). In addition, if TCS plans to rely on a date of invention earlier than the filing date of the '748 patent, it must so prove by clear and convincing evidence.

Mobile 365 argues that as early as August 3, 2000 the InphoXchange system embodied each and every limitation of the asserted claims of the '748 patent. TCS argues that Mobile 365 has not

shown prior conception by clear and convincing evidence, has not shown that it reduced the invention claimed in the '748 patent to practice before TCS, and has failed to show that an invention containing all elements of the '748 patent was invented "in this country" as required by § 102(g)(2). Because these material issues are unresolved, the Court finds summary judgment improper.

## IV.

For the foregoing reasons, Mobile 365's Motion for Summary Judgment and TCS's Motion for Summary Judgment are DENIED as per the Court's Order of May 1, 2007 (**Dkt No. 83**).

/s/
James R. Spencer
Chief United States District Judge

ENTERED this  20th  day of August 2007